Kelli **DOLLARD**, Plaintiff,

v.

**Charles R. ALLEN, M.D.; John A. Whipp, M.D.; Fremont Orthopedic Associates, P.C.; and Lander Valley Medical Center, LLC, Defendants.**

No. 02–CV–87–B.

United States District Court, D. Wyoming.

May 1, 2003.

Mel C. Orchard, III, Meyer & Williams, Jackson, WY, for Plaintiff.

Jeffrey C. Brinkerhoff, Brown, Drew & Massey, Casper, WY, Corinne E. Rutledge, James Kaste, Lathrop and Rutledge, Cheyenne, WY, Scott E. Ortiz, Williams, Porter, Day & Neville, Casper, WY, for Defendants Charles R. Allen, M.D., John A. Whipp, M.D. and Fremont Orthopedic Associates, P.C., Lander Valley Medical Center, LLC.

## ORDER GRANTING LANDER VALLEY MEDICAL CENTER, LLC'S MOTION FOR PARTIAL SUMMARY JUDGMENT

BRIMMER, District Judge.

This case arises out of the unanticipated compression of Plaintiff's sacral nerve roots. The matter is before the Court on Defendant Lander Valley Medical Center, LLC's Motion for Partial Summary Judgment. Upon reading the briefs, hearing oral argument, and being fully advised of the premises, the Court FINDS and ORDERS as follows:

### Statement of Parties and Jurisdiction

Plaintiff, Kelli Dollard, is a thirty-two year old female who resides in Lander, Wyoming.

Defendant Lander Valley Medical Center, LLC ("LVMC") is a Wyoming limited liability company with its principal place of business in Lander, Wyoming. LVMC is subject to the provisions of the Emergency Medical Treatment and Active Labor Act ("EMTALA"). 42 U.S.C. §§ 1395cc, 1395dd(e)(2).

The Court exercises jurisdiction pursuant to 28 U.S.C. §§ 1331, 1367. Venue is proper. 28 U.S.C. § 1391(b).

### Background

In December 1998, Plaintiff was working as a certified nursing assistant at the LVMC. (Def. LVMC's Mot. for Partial Summ. J. ("Def.'s Mot. for Summ. J."), Exh. C, at pp. 10, 55). While Plaintiff was assisting a patient shower, she slipped on some soapy water and fell. (*Id.* at pp. 58–59). As a result of the fall, Plaintiff suffered a herniated disc in her back. (*Id.* at p. 11).

On December 28, 1998, Plaintiff visited Dr. Charles R. Allen regarding her back injury. (*Id.* at p. 58). A little over a year later, Plaintiff visited Dr. Allen again because she was suffering from severe lower back pain. (*Id.* at p. 66). Plaintiff periodically visited Dr. Allen for the next six months while she received spinal injections in an attempt to alleviate her lower back pain. (*Id.* at pp. 69, 72, 76–79, 81, 84).

On June 25, 2000, Plaintiff began experiencing numbness in her buttocks. (*Id.* at p. 90). The next morning, Plaintiff called Dr. Allen and informed him that her back pain was getting worse and that she felt numbness in her buttocks. (*Id.* at pp. 93–95). Dr. Allen informed Plaintiff that he would prescribe some pain medication for her. (*Id.*). Plaintiff picked up that pain medication and returned home to rest. (*Id.* at p. 87).

On the morning of June 27, 2000, Plaintiff called Dr. Allen again. (*Id.* Exh. C, at p. 100). Plaintiff informed Dr. Allen that her pain medication was not helping and that her back pain was getting worse. (*Id.*). Upon learning this, Dr. Allen informed Plaintiff that he wanted to admit her to the hospital for pain management and rest. (*Id.*, Exh. A, at pp. 96–97).

That day, Plaintiff arrived at the LVMC around 1:45 p.m. (*Id.* Exh. C, at p. 108). When Plaintiff arrived, she walked past the hospital lobby and directly to the medical/surgery unit. (*Id.* at p. 100). Plaintiff did not go to the emergency room for the purpose of an examination or medical screening. (*Id.* at p. 239). When Plaintiff arrived at the hospital, she knew she was being admitted because of her back pain, as she had discussed with Dr. Allen earlier that day. (*Id.* at p. 240). Plaintiff did not anticipate being examined or diagnosed by any physician other than Dr. Allen during her stay at the LVMC. (*Id.*).

Once Plaintiff was in the medical/surgery unit, a nurse took her to a hospital room. (*Id.* at p. 100). Per Dr. Allen's written instructions, Plaintiff was administered a shot of pain medicine and given a heating pad for her lower back. (*Id.* at p. 100; Exh. A, at p. 106; Pl.'s Resp. to Def. LVMC's Mot. for Partial Summ. J. ("Pl.'s Resp."), Exh. D, at p. 10113).

On June 28, 2000, around 9:30 a.m., Dr. Allen visited Plaintiff. (*Id.*, Exh. C, at p. 105). Plaintiff informed Dr. Allen that she was "feeling okay" and that the burning in her legs and lower back pain were not as severe. (*Id.*). Plaintiff also informed Dr. Allen that she felt an increase in the numbness she was experiencing. (*Id.*). After this discussion with Plaintiff, Dr. Allen made the decision to discharge Plaintiff from the hospital. (*Id.* at p. 246).

On the morning of June 29, 2000, Plaintiff began experiencing excruciating pain in her stomach and was unable to urinate. (*Id.* at p. 117). Plaintiff called the hospital and was readmitted that evening. (*Id.* at pp. 120–21). At LVMC, Dr. John A. Whipp determined that Plaintiff had a large ruptured disc in her back, which had been the cause of her severe pain and numbness. (*Id.*).[1] On June 30, 2000, Dr. Whipp performed surgery on Plaintiff's lower back. At that time, it was determined Plaintiff was suffering from "almost a cauda equina type syndrome," which is an extremely rare neurological disorder.[2] (Pl.'s Resp., Exh. D, at p. WHI0116). Symptoms of the cauda equina syndrome include: (1) bilateral sciatica; (2) bowel and bladder dysfunction; (3) analgesia in the buttocks, genitalia, and thigh area; and (4) a decrease in rectal sphincter tone. (Def.'s Mot. for Summ. J., Exh. A, at p. 11; Pl.'s First Supplemental Resp., at pp. 117); *see also* 13 Roscoe N. Gray, M.D., & Louise J. Gordy, M.D., *Attorneys' Textbook of Medicine* § 176.32 (3d ed. & Supp. 2002). Cauda equina syndrome has been described as "the only true low back pain emergency." *Id.*

Plaintiff filed suit alleging that LVMC violated EMTALA, 42 U.S.C. § 1395dd, and was negligent in treating and discharging her. (First Am. Compl., at ¶¶ 15–33). Specifically, Plaintiff alleges that LVMC failed to properly screen and stabilize her emergency medical condition. (*Id.* at ¶ 29).

### Legal Standard

Summary judgment is proper when there is no genuine issue of material fact to be resolved at trial. Fed.R.Civ.P. 56(c);

---

**1.** Dr. Whipp took over caring for Plaintiff because Dr. Allen was unavailable. Dr. Allen testified that he could not remember where he was on June 28, 2000, but thought that he may have been in Jackson, Wyoming. (Pl.'s Mot. for Summ. J., Exh. A, at pp. 147–48).

**2.** Cauda equina syndrome is an impairment of the nerves in the cauda equina, which is the bundle of spinal nerve roots that extrude from the lower end of the spinal cord. (Pl.'s First Supplemental Resp., at pp. 129); 4 Roscoe N. Gray, M.D., & Louise J. Gordy, M.D., *Attorneys' Textbook of Medicine* §§ 12.33, 12.92 (3d ed. & Supp.2002). Cauda equina syndrome is caused by compression of the sacral nerve roots. *Id.* at § 12.92. The syndrome is considered extremely rare. *Id.*

*Nebraska v. Wyoming,* 507 U.S. 584, 590, 113 S.Ct. 1689, 123 L.Ed.2d 317 (1993). Thus, a district court may grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *Nelson v. Geringer,* 295 F.3d 1082, 1086 (10th Cir.2002). "An issue of material fact is genuine where a reasonable jury could return a verdict for the party opposing summary judgment." *Seymore v. Shawver & Sons. Inc.,* 111 F.3d 794, 797 (10th Cir.1997).

### Analysis

I. *Plaintiff's EMTALA Claims.*

Defendant LVMC argues that Plaintiff's EMTALA claims fail because she was never presented at LVMC's emergency department. (Def. LVMC's Mem. of Law in Supp. of Mot. for Partial Summ. J., at pp. 7–11). Alternatively, Defendant LVMC argues that even if EMTALA applies to individuals who are not admitted to a hospital's emergency department, Plaintiff has not raised a genuine issue of material fact that LVMC failed to follow its medical screening procedures or that she had an emergency medical condition that needed to be stabilized. (*Id.*).

Plaintiff responds that LVMC had a duty to screen her for an emergency medical condition and to stabilize that condition notwithstanding the fact she never went to LVMC's emergency department. (Pl.'s Resp., at pp. 5, 9–11). Plaintiff also argues that LVMC violated its own policies

and procedures regarding medical screening and stabilization. (*Id.* at pp. 5–8).

A. EMTALA Standards.

1. EMTALA's Substantive Provisions.

▮▮▮ Congress' purpose in enacting EMTALA was to prevent patient dumping—the practice of refusing to treat uninsured patients. *Abercrombie v. Osteopathic Hosp. Founders Ass'n,* 950 F.2d 676, 680 (10th Cir.1991).[3] EMTALA was not designed to function as a federal malpractice statute or to supplant state law medical malpractice suits. 42 U.S.C. § 1395dd(f); *Repp v. Anadarko Mun. Hosp.,* 43 F.3d 519, 522 (10th Cir.1994); *Phillips v. Hillcrest Med. Center,* 244 F.3d 790, 798–99 (10th Cir.2001).

A hospital can violate EMTALA in two ways. 42 U.S.C. § 1395dd(a)-(c). First, under EMTALA's medical screening requirement, a hospital is liable when it fails to follow its own standard screening procedures in determining whether an individual who "comes to the emergency department" of the hospital has an emergency medical condition. 42 U.S.C. § 1395dd(a); *Repp,* 43 F.3d at 522 & n. 4. Under the plain language of § 1395dd(a), the medical screening requirement is not implicated if the plaintiff "did not go to the emergency room of the hospital." *Urban v. King,* 43 F.3d 523, 525 n. 2 (10th Cir.1994). Second, under EMTALA's stabilization before transfer requirement, a hospital is liable if it detected an emergency medical condition for any individual who came "to the hospital," but failed to stabilize that condition

---

**3.** Since EMTALA's enactment as part of the Consolidated Omnibus Budget Reconciliation Act, Pub.L. No. 99–272, § 9121 (1986), courts have struggled with the interpretation of the Act. It is safe to assume that § 1395dd has not made its way into any textbooks on statutory construction as a model of Congress' ability to draft a plain and unambiguous statute. Con-

sequently, the Tenth Circuit has routinely resorted to, and emphasized the importance of, EMTALA's legislative history in construing the Act and explaining its limited purpose. *See Phillips v. Hillcrest Med. Center,* 244 F.3d 790, 798–99 (10th Cir.2001); *Ingram v. Muskogee Reg'l Med. Center,* 235 F.3d 550, 552 (10th Cir.2000).

before transferring the individual. 42 U.S.C. § 1395dd(b)-(c); *Collins·v. DePaul Hosp.*, 963 F.2d 303, 305, 308 (10th Cir. 1992).

### 2. The Conjunctive and Disjunctive Approaches to EMTALA.

In enacting EMTALA, Congress did not conjugate any of the subsections of § 1395dd. The Circuit Courts of Appeal are split on whether EMTALA should be construed in the conjunctive or disjunctive. The Tenth Circuit has not provided district courts in this Circuit with a clear direction on which approach it follows.

#### a. The Conjunctive Approach to EMTALA.

Under the conjunctive approach, EMTALA is construed as setting forth one cause of action based upon three sequential requirements. First, under subsection (a), the hospital has the duty to screen any individual who comes to the hospital emergency department to determine if an emergency medical condition exists. 42 U.S.C. § 1395dd(a). If the hospital determines through its standard screening procedures that the individual who presents himself in the emergency department has an emergency medical condition, then subsection (b) requires the hospital to treat and stabilize that condition, *id.* § 1395dd(b)(1)(A), or to transfer that individual in accordance with subsection (c), *id.* § 1395dd(b)(1)(B). In turn, subsection (c) restricts the transfer of the unstabilized individual unless certain requirements are satisfied. *Id.* § 1395dd(c)(1)(A)(i)-(iii).

Under this approach, subsections (a), (b), and (c) of EMTALA all relate to a single sequence of events; hence, the threshold issue is whether an individual came to the hospital's emergency department. The Eleventh, Fourth, Sixth, and Ninth Circuits appear to follow this approach to EMTALA.[4]

#### b. The Disjunctive Approach to EMTALA.

Under the disjunctive approach, EMTALA is construed as setting forth distinct causes of action under its medical screening requirement in subsection (a) and its stabilization requirement in subsection (b). The First Circuit has issued the principal opinion supporting this construction of EMTALA. *Lopez–Soto v. Hawayek, M.D.*, 175 F.3d 170 (1st Cir.1999). There, the First Circuit reasoned that EMTALA should be construed as setting forth separate causes of action because:

> [The language of subsection (b) ] unambiguously imposes certain duties on covered hospitals vis-a-vis any victim of a detected medical emergency, regardless of how that person enters the institution or where within the walls he may be when the hospital identifies the problem.... Nothing in the subsection's text suggest a necessary relationship between the hospital's obligations and the identity of the department within the hospital to which the afflicted individual presents himself.

*Id.* at 173 (internal citations omitted, emphasis in original). Three district courts

4. *See Harry v. Marchant,* 291 F.3d 767, 770 (11th Cir.2002) (noting that under EMTALA, *emergency rooms* are subject to two principle obligations, commonly referred to as the appropriate medical screening requirement and the stabilization requirement); *Bryan v. Rectors and Visitors of the Univ. of Va.,* 95 F.3d 349, 352 (4th Cir.1996) (holding that the stabilization requirement was intended to regu-late the hospital's care only after emergency treatment); *Thornton v. Southwest Detroit Hosp.,* 895 F.2d 1131, 1134 (6th Cir.1990) (noting that once a patient is found to suffer from an emergency medical condition *in the emergency room,* she cannot be discharged until the condition is stabilized); *James v. Sunrise Hosp.,* 86 F.3d 885, 889 (9th Cir. 1996).

have also followed this approach. *See Reynolds v. Mercy Hosp.*, 861 F.Supp. 214, 222 (W.D.N.Y.1994); *McIntyre v. Schick*, 795 F.Supp. 777, 780 (E.D.Va.1992); *Helton v. Phelps County Regional Med. Center*, 794 F.Supp. 332, 333 (E.D.Mo.1992).

#### c. The Tenth Circuit's Approach to EMTALA.

The Tenth Circuit has only addressed EMTALA nine times.[5] A close reading of those opinions does not indicate whether the Tenth Circuit would construe EMTALA in the disjunctive or conjunctive.

On the one hand, the Tenth Circuit appears to require presentment to the hospital's emergency department as an essential element of a cause action under both subsection (a) and (b) of EMTALA. *See Stevison*, 920 F.2d at 712–13 (upholding jury instruction which provided that presentment in the hospital's emergency department was an essential element of a § 1395dd cause of action); *Collins*, 963 F.2d at 305 (paraphrasing EMTALA's provisions and indicating that a threshold issue is whether any individual came, or was brought to, a hospital's emergency department); *see also Morrison v. Colo. Permanente Med. Group P.C.*, 983 F.Supp. 937, 947 (D.Colo.1997) (explaining that under Tenth Circuit precedent, the threshold requirement to state a claim under subsection (a) or (b) of EMTALA is for the plaintiff to establish that she showed up at the hospital's emergency room with an emergency medical condition). In *Delaney*, the Tenth Circuit explained that a hospital can violate EMTALA's transfer restrictions under subsection (c) "through the operation of its *emergency room* by failing to stabilize a patient's emergency medical condition before transferring or releasing the patient." *Delaney*, 986 F.2d at 391–92 (emphasis added).

On the other hand, the Tenth Circuit's decision in *Urban v. King* seems to compel a different result. In *Urban*, the plaintiff was pregnant with twins and went to the hospital's obstetrics department for a stress test. 43 F.3d at 524. The plaintiff never went to the hospital's emergency room. *Id.* at 525 n. 2. After the test, the plaintiff was instructed to come back the next day for another stress test. *Id.* During the plaintiff's repeat stress test the next day, it was determined that something was wrong with her twins. *Id.* After a caesarian section was performed that day, one baby was delivered stillborn and the other with brain damage. *Id.* The Tenth Circuit held that the hospital did not discharge plaintiff on the first day in violation of EMTALA because it did not know of her emergency medical condition. *Id.* at 527.

In so holding, the Tenth Circuit indicated that if an individual is never presented at the hospital's emergency department, the medical screening requirement under subsection (a) of EMTALA is irrelevant. *Id.* at 525 n. 2. The Tenth Circuit also explained that subsections (b) and (c) of EMTALA must be read together; however, the plaintiff did not have to show a violation of subsection (a) to maintain an action under subsection (c). 43 F.3d at 526. The Tenth Circuit also made clear that EMTALA's "stabilization and transfer requirements [subsections (b) and (c) ] do not apply until the hospital determines the

---

**5.** *See Stevison v. Enid Health Sys., Inc.*, 920 F.2d 710 (10th Cir.1990); *Abercrombie v. Osteopathic Hosp. Founders Ass'n*, 950 F.2d 676 (10th Cir.1992); *Collins v. DePaul Hosp.*, 963 F.2d 303 (10th Cir.1992); *Delaney v. Cade*, 986 F.2d 387 (10th Cir.1993); *Urban v. King*, 43 F.3d 523 (10th Cir.1994); *Repp v. Anadar-* *ko Municipal Hosp.*, 43 F.3d 519 (10th Cir. 1994); *Ingram v. Muskogee Regional Med. Center*, 235 F.3d 550 (10th Cir.2000); *Phillips v. Hillcrest Med. Center*, 244 F.3d 790 (10th Cir.2001); and *St. Anthony Hosp. v. U.S. Dep't of Health and Human Services*, 309 F.3d 680 (10th Cir.2002).

individual has an emergency medical condition." *Id.* Thus, a "hospital cannot be held to stabilize an emergency situation without knowing an emergency exists." *Id.* at 525.

### B. Application.

Plaintiff's Complaint appears to allege a violation of EMTALA's medical screening and stabilization before transfer requirements. (Pl.'s First Am. Compl., at ¶ 29). In interpreting EMTALA, this Court is cognizant of its duty to interpret the statute by giving effect to every subsection of the Act, if possible, and to follow Circuit precedent. *TRW Inc. v. Andrews,* 534 U.S. 19, 31, 122 S.Ct. 441, 151 L.Ed.2d 339 (2001).

▪ The Tenth Circuit recognizes a disjunction between the medical screening requirement, § 1395dd(a), and the stabilization before transfer requirement, § 1395dd(b)-(c). Thus, a plaintiff may maintain an action under EMTALA by showing a "violation of *either* § 1395dd(a) or § 1395dd(c); [the plaintiff] need not show a violation of both subsections." *Urban,* 43 F.3d at 525 (emphasis added). However, a plaintiff must demonstrate a violation of EMTALA's stabilization requirement, § 1395dd(b), as a condition precedent to recovering under EMTALA's transfer provision, § 1395dd(c). *Id.* at 527.

### 1. Plaintiff's Medical Screening Claim.

Plaintiff argues that LVMC violated EMTALA's medical screening requirement because it failed to follow its own policies in determining whether she had an emergency medical condition. (Pl.'s Resp., at pp. 5–8). However, Plaintiff was never admitted to the LVMC's emergency department. Under the plain language of § 1395dd(a), a plaintiff must be presented to the hospital's emergency department in order to recover. *Urban,* 43 F.3d at 525 n.

2, 527. Thus, assuming Plaintiff has presented the Court with the correct screening procedures, those medical screening procedures are still irrelevant because § 1395dd(a) was never implicated. (Pl.'s Resp., at pp. 4–8 & Exh. A). Therefore, Plaintiff's claim under § 1395dd(a) fails.

### 2. Plaintiff's Stabilization before Transfer Claim.

▪ Plaintiff argues that "LVMC violated EMTALA by discharging [her] with neurological abnormalities that the nursing staff knew about and charted, at times, but who failed to properly test and screen, and/or chart the neurological symptoms completely." (*Id.* at p. 10). This argument fails for two reasons.

▪ First, Plaintiff has failed to present any evidence that LVMC had actual knowledge of her unstabilized emergency medical condition when it discharged her on June 28, 2000. The Tenth Circuit has held that a plaintiff must prove the hospital had "actual knowledge of the individual's unstabilized emergency medical condition to succeed on a claim under § 1395dd(c)." *Urban,* 43 F.3d at 526. All the evidence submitted in the parties' briefs, when viewed in the light most favorable to Plaintiff, indicates that neither the Plaintiff, Dr. Allen, nor LVMC's medical staff knew Plaintiff was suffering from an emergency medical condition when she was discharged. (Pl.'s Resp., Exh. D, at p. 10111).

Plaintiff testified that she told Dr. Allen that she was "okay" and that the burning in her legs had gone away, although she still had some pain and numbness in her back. (Def.'s Mot. for Summ. J., Exh. C, at p. 105). Dr. Allen testified that Plaintiff told him that she was feeling "fine and ready to go home." (*Id.,* Exh. A, at pp. 138–39). Dr. Allen's medical reports, submitted by Plaintiff, also indicate that Plain-

tiff said she was "comfortable" and wanted to go home. From this evidence, the Court is left with the inescapable conclusion that LVMC did not have "actual knowledge" of Plaintiff's unstabilized emergency medical condition. *Urban,* 43 F.3d at 526. Accordingly, since LVMC never determined that Plaintiff had an emergency medical condition, EMTALA's stabilization before transfer requirement does not apply. *Id.; Holcomb v. Monahan,* 30 F.3d 116, 117 (11th Cir.1994).

■ Second, LVMC did not violate EMTALA's stabilization before transfer requirement because that provision does not apply to individuals that have been admitted to the hospital for inpatient care. *Bryan v. Rectors and Visitors of the Univ. of Va.,* 95 F.3d 349, 352 (4th Cir.1996); *Bryant v. Adventist Health Sys./West,* 289 F.3d 1162, 1167 (9th Cir.2002). A different reading of EMTALA renders the Act's preemption subsection superfluous. 42 U.S.C. § 1395dd(f); *Andrews,* 534 U.S. at 31, 122 S.Ct. 441 (noting that it is a "cardinal rule" of statutory construction to construe the statute as whole so as to render no part thereof insignificant). This is so because once LVMC assumed responsibility for Plaintiff's treatment by admitting her to the medical/surgery unit, it assumed liability under state tort law for negligent treatment. 42 U.S.C. § 1395dd(e)(3)(A)-(B) (defining stabilization to apply only during the transfer of a individual from the hospital); *Scott v. Hutchinson Hosp.,* 959 F.Supp. 1351, 1361 (D.Kan.1997). This "narrow interpretation ties the statute to its limited purpose, which was to eliminate patient-dumping and not to federalize medical malpractice." *Ingram,* 235 F.3d at 552. This interpretation makes EMTALA's stabilization before transfer requirement only applicable when state tort law does not apply and precludes the adoption of a standard tantamount to a federal malpractice statute. *See Repp,* 43 F.3d at 522.

## II. *Plaintiff's State Law Negligence Claims.*

■ At the hearing in this matter, LVMC argued that if the Court granted its motion for partial summary judgment, the Court should likewise decline to exercise supplemental jurisdiction over Plaintiff's state law negligence claims. The Court also heard from the other Defendants on this issue. Dr. Whipp and Dr. Allen informed the Court they wanted it to retain supplemental jurisdiction over the state law claims, but to change the venue to Lander, Wyoming for the sake of convenience. Plaintiff argued that the Court should retain supplemental jurisdiction over the state law negligence claims, but set the trial in Cheyenne, Wyoming. The Court had original jurisdiction over Plaintiff's EMTALA claims. 28 U.S.C. § 1331. Federal district courts have "supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367. A state law claim that derives from the same common nucleus of operative facts as the federal claim forms part of the same case or controversy for purposes of Article III. *United Inter'l Holdings, Inc. v. Wharf (Holdings) Ltd.,* 210 F.3d 1207, 1220 (10th Cir. 2000). The district court has the discretion to exercise supplemental jurisdiction over the state law claims or to dismiss those claims. *Id.;* 28 U.S.C. § 1367(c).

■ Plaintiff's state law negligence claims derive from the same common nucleus of operative facts as her federal EMTALA claims: her treatment at, and discharge from, LVMC. Hence, this Court may exercise supplemental jurisdiction over those claims. *Wharf (Holdings) Ltd.,* 210 F.3d at 1220. The Court finds this would be a proper case for the exercise of

supplemental jurisdiction because there is a substantial risk that this action would be delayed if re-filed in state court. Moreover, this Court has studied the record in this case extensively and believes it would be a waste of judicial resources to require a state court to familiarize itself with the same materials. Additionally, to avoid undue prejudice to Plaintiff, the trial will be held in Cheyenne, Wyoming.

### *Conclusion*

For the aforementioned reasons, Defendant Lander Valley Medical Center, LLC's Motion for Partial Summary Judgment on Plaintiff's claims alleging a violation of the Emergency Medical Treatment and Active Labor Act, 42 U.S.C. § 1395dd, is **GRANTED**. The Court will retain supplemental jurisdiction over the remaining state law claims. The trial in this matter will commence at 9:30 a.m. on June 16, 2003, in Cheyenne, Wyoming.