# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 25-506


JASON ALLEN

V.

LAFAYETTE GENERAL MEDICAL CENTER, INC.


**\*\*\*\*\*\*\*\*\*\***

APPEAL FROM THE
FIFTEENTH JUDICIAL DISTRICT COURT
PARISH OF LAFAYETTE, NO. 2025-0428, DIV. L
HONORABLE CYNTHIA SPANDONI, DISTRICT JUDGE

**\*\*\*\*\*\*\*\*\*\***

## LEDRICKA J. THIERRY
## JUDGE

**\*\*\*\*\*\*\*\*\*\***

Court composed of Shannon J. Gremillion, Sharon Darville Wilson, and Ledricka J. Thierry, Judges.


**AFFIRMED.**

**Jerri Gaines Smitko**
**Smitko Law, APLC**
**622 Belanger Street**
**P.O. Box 1669**
**Houma, LA 70361**
**(985) 851-1313**
**COUNSEL FOR PLAINTIFF/APPELLANT**
    **Jason Allen**

**Michael A. Dalman**
**Brooke Wilson-Schexnailder**
**Savoy & Delahoussaye**
**600 Jefferson St., Ste. 902**
**Lafayette, LA 70501**
**(337) 247-7821**
**COUNSEL FOR DEFENDANT/APPELLEE**
    **Lafayette General Medical Center, Inc. d/b/a**
    **Ochsner Lafayette General Medical Center**

**THIERRY, Judge.**

The issue in this appeal is whether Plaintiff's claims are subject to the Louisiana Medical Malpractice Act. We hold that they are and that Plaintiff was required to submit his claims to a medical review panel prior to filing this instant action. We affirm the trial court's judgment sustaining Defendant's exception of prematurity.

## FACTS AND PROCEDURAL HISTORY

Plaintiff, Jason Allen, was injured in a motor vehicle collision on January 18, 2023. He sustained multiple injuries, including several rib fractures, a complex comminuted intra-articular distal radius fracture, an ulnar styloid fracture, a hemothorax, and a pneumothorax. He was transported via ambulance to Lafayette General Medical Center following the collision.

While at Lafayette General, Allen received treatment for three days. The medical records show that Allen underwent imaging, bloodwork, testing, and treatment by multiple physicians. After his hemopneumothorax showed resolution and his rib fractures were deemed non-operative, he was discharged on January 21, 2023, with a plan for surgery the following week for his wrist injuries. Allen did not have medical insurance.

Upon returning home, Allen allegedly felt like he was going to die and called an ambulance. He was transported and admitted to Terrebonne General Medical Center ("Terrebonne"), where he underwent surgery for a VATS decortication procedure, a chest tube insertion for his hemothorax, and surgery for the distal radius fracture. He remained at Terrebonne for eight days.

Thereafter, Allen filed a lawsuit against Defendant, Lafayette General Medical Center, Inc. (d/b/a Ochsner Lafayette General Medical Center). He alleged,

in part, that Lafayette General violated the Emergency Medical Treatment and Active Labor Act ("EMTALA"), 42 USCA § 1395dd, when it "failed to provide medical treatment . . . to stabilize Plaintiff's emergency medical condition," knowing that he was uninsured. He further alleged that Lafayette General's failure to stabilize him caused a serious aggravation of his injuries.

Lafayette General filed an exception of prematurity, arguing that Allen's petition, though camouflaged as EMTALA violations, actually alleged medical malpractice. Therefore, Lafayette General contended that Allen's claims were required to be submitted to a medical review panel under the Louisiana Medical Malpractice Act (LMMA). In support, Lafayette General attached three exhibits which were admitted into evidence—Louisiana Patient's Compensation Fund Certificate of Enrollment for Ochsner Lafayette General Medical Center (showing it is a qualified health care provider), Plaintiff's Petition for Damages, and certified excerpts of the medical records of Jason Allen.

The trial court sustained the exception of prematurity and dismissed Allen's claims against Lafayette General. In so ruling, the trial court found that EMTALA did not apply because Allen "was admitted to the defendant hospital by a medical provider and received treatment for his condition over several days. Plaintiff's claims against Defendant occurred after the admission and were for treatment and subsequent discharge issues." Accordingly, the trial court held that Allen's claims were governed by the LMMA rather than EMTALA.

Allen appeals this ruling and alleges the trial court erred by sustaining Lafayette General's exception of prematurity.

**ANALYSIS**

Whether Allen's claims sound under EMTALA, the LMMA, or a combination of both, presents a question of law, and thus the standard of review is de novo. *Aziz v. Burnell*, 21-130, 21-188 (La.App. 3 Cir. 11/3/21), 330 So.3d 695.

**A.     Exception of Prematurity**

"The dilatory exception of prematurity provided in La.Code Civ.P. art. 926 questions whether the cause of action has matured to the point where it is ripe for judicial determination, because an action will be deemed premature when it is brought before the right to enforce it has accrued." *LaCoste v. Pendleton Methodist Hosp., L.L.C.*, 07-8, 07-16, p. 5 (La. 9/5/07), 966 So.2d 519, 523. The party asserting prematurity bears the burden of proving the LMMA applies. *Patterson v. Claiborne Operator Group, L.L.C.*, 55,264 (La.App. 2 Cir. 11/15/23), 374 So.3d 299.

Under La.Code Civ.P. art. 930, "evidence may be introduced to support or controvert any of the objections pleaded, when the grounds thereof do not appear from the petition." In the absence of evidence, "the court must render its decision on the exception based upon the facts as alleged in the petition, and all allegations therein must be accepted as true." *LaCoste*, 966 So.2d at 525. However, if evidence is admitted at the hearing on the exception, then the court must render its decision on the evidence presented, rather than on the allegations contained in the petition. *Aziz*, 330 So.3d 695. Evidence was admitted at the hearing in this case, including Allen's medical records at Lafyette General, and thus we must render our decision on the evidence presented.

When the petition alleges medical malpractice against a qualified health care provider, the claim is subject to dismissal on an exception of prematurity if not first brought before a medical review panel. La.R.S. 40:1231.8. When a petition includes

both LMMA and EMTALA claims, the malpractice claims must be brought before a medical review panel, while EMTALA claims may proceed directly in court. *Spradlin v. Acadia-St. Landry Med. Found.*, 98-1977 (La. 2/29/00), 758 So.2d 116. Furthermore, any ambiguity must be resolved in favor of the plaintiff and against a finding that the claims sound in medical malpractice. *LaCoste*, 966 So.2d 519.

## B.     EMTALA

Since it is possible to allege claims under both EMTALA and the LMMA, we will first consider whether Allen's petition, along with the evidence introduced at the hearing, raises an EMTALA claim. Allen argues that his claims are purely EMTALA claims, while Lafayette General argues that Allen's claims sound in medical malpractice, urging us to look beyond the legal theory pled in the petition to the evidence submitted at the hearing.

Congress enacted EMTALA in 1986 in response to hospitals engaging in patient "dumping"—that is, refusing to treat patients who presented with medical emergencies, or transferring them to public hospitals prior to stabilization, due to their lack of insurance or means to pay for medical care. *Spradlin*, 758 So.2d 116. Under EMTALA, when an individual presents with an emergency medical condition at a hospital, the hospital generally must transfer the individual to another medical facility or provide medical examination and treatment required to stabilize the medical condition. 42 U.S.C.A. § 1395dd(b). Additionally, a hospital may not transfer an individual who "has an emergency medical condition which has not been stabilized," except in limited situations that are not applicable here. 42 U.S.C.A. § 1395dd(c).

4

The crux of the issue here involves stabilization, as Allen alleged he was not stabilized prior to his discharge, in violation of EMTALA. "Stabilization" under EMTALA is defined as follows:

> (A) The term "to stabilize" means, with respect to an emergency medical condition described in paragraph (1)(A), to provide such medical treatment of the condition as may be necessary to assure, within reasonable medical probability, that no material deterioration of the condition is likely to result from or occur during the transfer of the individual from a facility, or, with respect to an emergency medical condition described in paragraph (1)(B), to deliver (including the placenta).

> (B) The term "stabilized" means, with respect to an emergency medical condition described in paragraph (1)(A), that no material deterioration of the condition is likely, within reasonable medical probability, to result from or occur during the transfer of the individual from a facility, or, with respect to an emergency medical condition described in paragraph (1)(B), that the woman has delivered (including the placenta).

42 U.S.C.A. § 1395dd(e)(3).

Notwithstanding the above definitions, there is no uniform consensus regarding when a hospital's stabilization requirement ends. The Fourth and Ninth Circuits hold that a hospital's duty to stabilize ends once the patient is admitted for inpatient care, while the Sixth Circuit holds that the duty requires stabilizing the patient's emergency medical condition prior to discharge, however long that may take. *See, e.g.*, *Bryan v. Rectors & Visitors of the Univ. of Va.*, 95 F.3d 349 (4th Cir. 1996); *Bryant v. Adventist Health Sys./West*, 289 F.3d 1162 (9th Cir. 2002); *cf. Thornton v. Sw. Detroit Hosp.*, 895 F.2d 1131 (6th Cir. 1990). In 2003, Centers for Medicare and Medicaid Services ("CMS") interpreted and implemented EMTALA, codified in 42 CFR 489.24. Under that regulation, a hospital satisfies its stabilization requirement when it admits a patient "in good faith in order to stabilize the emergency medical condition." 42 CFR 489.24(d)(2)(i). Despite this CMS

regulation, the federal circuit split persists.[1] *See, e.g.*, *Duffus v. MaineHealth*, 791 F. Supp.3d 61 (D. Me. 2025); *Moses v. Providence Hosp. & Med. Ctrs., Inc.*, 561 F.3d 573 (6th Cir. 2009).

Fortunately, we need not resolve the circuit split. Our review of the record supports the trial court's ruling, regardless of whether the stabilization duty ends upon inpatient admittance or when the emergency medical condition is stabilized.

In this case, there is no dispute that Lafayette General admitted Allen for inpatient care and treated him for approximately three days before discharging him. Allen was first treated in the emergency department on January 18, 2023, by Dr. Rochelle Duplechin, an emergency room physician, where he underwent several x-rays, CT scans, and bloodwork analysis. Thereafter, Allen was treated by Dr. Blake Saul, an orthopedic trauma surgeon, and was admitted to the hospital. Over the course of the next three days, he was evaluated by Dr. Sagar Shah, who determined that Allen would need at least two wrist surgeries. The medical records reflect that

---

[1] The Fifth Circuit, which includes Louisiana, has not definitively resolved this issue. However, lower courts within the Fifth Circuit tend to align with CMS's promulgation. For example, in *Thornhill v. Jackson Par. Hosp.*, 184 F. Supp.3d 392, 401 (W.D. La. 2016), the Western District of Louisiana held (emphasis added):

> **Once a hospital admits a patient in good faith, that concern has been addressed and state medical malpractice law supplies the relief.** Moreover, the statute's language, as well as its Legislative history, clearly evince a desire to avoid preempting state law. By finding that the duty under EMTALA extends until stabilization, no matter when that may be, the Sixth Circuit's interpretation arguably offends the statute's hesitation to avoid preemption. *See Dollard v. Allen*, 260 F.Supp.2d 1127, 1135 (D.Wyo.2003) (finding that an interpretation of EMTALA which extends the hospital's duty to individuals admitted to the hospital would render the preemption provision superfluous); *see also Bryant*, 289 F.3d at 1169. ("If EMTALA liability extended to inpatient care, EMTALA would be convert[ed]...into a medical malpractice statute, something it was never intended to be"). The CMS' interpretation addresses that concern by precluding EMTALA's applicability when the hospital admits a patient in good faith in order to stabilize the emergency medical condition. Thus, the Court concludes that CMS' interpretation of EMTALA is permissible. This conclusion squares with the result reached by the majority of courts that have considered EMTALA's applicability to inpatient care.

Dr. Shah planned to see Allen the following week for surgery. The medical records also state that Allen's hemopneumothorax "showed resolution," that his rib fractures were evaluated and deemed non-operative, and that he would have outpatient surgery for his left forearm fractures. Allen was initially set to be discharged on January 20, 2023. However, after a drop in his oxygen saturation, his discharge was deferred by one day to January 21, 2023. Regarding his discharge, the medical records state, "Patient otherwise had an uneventful hospital course and is now stable for discharge."

Our review of the record shows that Allen received consistent treatment while at Lafayette General. The fact that he remained at Lafayette General for three days, while receiving multiple imaging, tests, and physician visits, shows that Lafayette General admitted him inpatient in good faith, thus satisfying the stabilization requirement as defined by the Fourth and Ninth Circuits. We also find it significant that Lafayette General originally planned to discharge Allen on January 20, 2023, but delayed his discharge by a day to ensure he was stabilized.

Even if we followed the Sixth Circuit's interpretation and agreed that Lafayette General's duty to stabilize extends beyond inpatient admittance and until the emergency medical condition is stabilized, our affirmance still stands. The only evidence in the record regarding Allen's status at discharge—Allen's Lafayette General medical records—leads to the inescapable conclusion that he was stabilized prior to discharge. The medical records state that Allen was "stable for discharge," a statement that was substantiated by imaging, lab results, and vital signs. Since evidence was admitted at the hearing on the exception, including the medical records, we must render our decision on the evidence presented and look beyond the allegations contained in the petition. *Aziz*, 330 So.3d 695. As the Fifth Circuit has

7

held, "EMTALA requires only that a hospital stabilize an individual's emergency medical condition; it does not require a hospital to cure the condition." *Green v. Touro Infirmary*, 992 F.2d 537, 539 (5th Cir. 1993). Lafayette General was not required to cure Allen's injuries; rather, it was only required to stabilize his emergency medical condition. We find that Lafayette General did so.

## C.    The LMMA

Since we hold that Allen's petition does not sound in EMTALA, we now consider whether his petition alleges medical malpractice.

The Louisiana Medical Malpractice Act ("LMMA"), La.R.S. 40:1231.1 et seq., defines "medical malpractice" as:

> any unintentional tort or any breach of contract based on health care or professional services rendered, or which should have been rendered, by a health care provider, to a patient, including but not limited to failure to render services timely and the handling of a patient, loading and unloading of a patient, and all legal responsibility of a health care provider arising from acts or omissions during the procurement of blood or blood components, in the staffing, training, or supervision of health care providers, or from defects in blood, tissue, transplants, drugs, and medicines, or from defects in or failures of prosthetic devices implanted in or used on or in the person of a patient. This includes all acts associated with the medical treatment of an individual, whether directly related to clinical care or performed in an administrative or managerial capacity necessary for the delivery of such care.

La.R.S. 40:1231.1(13). The LMMA defines a tort as:

> any breach of duty or any negligent act or omission proximately causing injury or damage to another. The standard of care required of every health care provider, except a hospital, in rendering professional services or health care to a patient, shall be to exercise that degree of skill ordinarily employed, under similar circumstances, by the members of his profession in good standing in the same community or locality, and to use reasonable care and diligence, along with his best judgment, in the application of his skill.

La.R.S. 40:1231.1(22).

8

In determining whether a claim sounds in medical malpractice, courts consider six factors as set forth in *Coleman v. Deno*, 01-1517 (La. 1/25/02), 813 So.2d 303:

1. Whether the wrong alleged is related to treatment or caused by professional negligence;

2. Whether the wrong alleged requires expert medical evidence to determine whether a the standard of care of breached;

3. Whether the act or omission involved assessing the patient's condition;

4. Whether the incident occurred within the context of a physician-patient relationship or a hospital's licensed scope of activities;

5. Whether the alleged injury would have occurred had the patient not sought treatment; and

6. Whether the alleged tort was intentional.

In *Coleman*, the supreme court held that, although EMTALA claims and medical malpractice claims often overlap, "Coleman's claim of 'dumping'— improper transfer—is one of malpractice governed by the MMA." *Id.* at 315. Here, too, we hold that Allen's claims are malpractice governed by the LMMA.

First, the wrong alleged is Lafayette General's failure to stabilize Allen prior to discharge. Essentially, Allen alleged that he suffered damages due to the hospital's failure to properly treat him. Thus, the decision to discharge Allen was necessarily treatment-related. Second, whether Lafayette General satisfactorily stabilized Allen prior to discharge requires expert medical evidence. Contrary to cases of "obvious negligence," in which no expert testimony is required, the allegations here cannot "be evaluated on common knowledge." *Id.* at 317. Third, the act of discharging Allen clearly involved an assessment of his condition, as evidenced by the medical records. Fourth, the decision to discharge Allen occurred within the context of a physician-

9

patient relationship and was within the scope of activities Lafayette General was licensed to perform. The remaining factors have limited value here, as the alleged wrong is a failure to treat, which is subsumed in the first factor, and Allen did not allege an intentional tort.

We hold that Allen's claims allege medical malpractice. Since Lafayette General submitted evidence of its status as a qualified health care provider, the LMMA applies to Allen's claims. Allen did not submit his claims to a medical review panel prior to filing suit, as required by the LMMA, and thus the trial court was correct in sustaining Lafayette General's exception of prematurity.

## DECREE

For the foregoing reasons, we affirm the trial court's judgment sustaining Defendant's exception of prematurity. Costs of this appeal are assessed to Appellant, Jason Allen.

**AFFIRMED.**