Shannon PRESTON,
Plaintiff-Appellant-Petitioner,

Charles JOHNSON and
Estate of Bridon M. Johnson,
Plaintiffs,

v.

MERITER HOSPITAL, INC. and
Wisconsin Patients Compensation Fund,
Defendants-Respondents.

Supreme Court

*No. 2003AP1376. Oral argument April 28, 2005.
—Decided July 13, 2005.*

2005 WI 122

(Also reported in 700 N.W.2d 158.)

For the plaintiff-appellant-petitioner there were briefs by *Scott D. Obernberger* and *Obernberger & Associates, LLC,* Milwaukee, *James M. Bopp, Jr.* and *Thomas J. Marzen* and National Legal Center for the Medically Dependent & Disabled, Inc., Terre Haute, IN, and oral argument by *Thomas J. Marzen.*

For the defendant-respondent, Meriter Hospital, Inc., there was a brief by *Curtis S. Swanson, David J. Pliner* and *Corneille Law Group, L.L.C.,* Madison, and oral argument by *David J. Pliner.*

¶ 1. DAVID T. PROSSER, J. This is a review of a published decision of the court of appeals, *Preston v. Meriter Hospital, Inc.*, 2004 WI App 61, 271 Wis. 2d 721, 678 N.W.2d 347. Shannon Preston and Charles Johnson, in their personal capacity and as personal representatives of their son Bridon's estate, filed a complaint asserting four claims against Meriter Hospital and the Wisconsin Patients Compensation Fund.[1] The court of appeals affirmed the circuit court's grant of summary judgment to Meriter on all four claims, but it determined that the plaintiff's claim under the Emergency Medical Treatment and Active Labor Act (EMTALA), 42 U.S.C. § 1395dd (1994),[2] really amounted to two claims, one of which was not addressed and thus dismissed by the circuit court. Preston petitioned this court to review the dismissal of this second EMTALA claim, that Meriter Hospital failed to give Bridon an appropriate medical screening examination in violation of 42 U.S.C. § 1395dd(a).

---

[1] We will refer to Shannon Preston, Charles Johnson, and the Estate of Bridon Michael Johnson collectively as Preston.

[2] In the case of a hospital that has a hospital emergency department, if any individual (whether or not eligible for benefits under this subchapter) comes to the emergency department and a request is made on the individual's behalf for examination or treatment for a medical condition, the hospital must provide for an appropriate medical screening examination within the capability of the hospital's emergency department, including ancillary services routinely available to the emergency department, to determine whether or not an emergency medical condition (within the meaning of subsection (e)(1) of this section) exists.

42 U.S.C. § 1395dd(a) (1994). All references to the United States Code are to the 1994 edition, unless otherwise stated.

¶ 2.  EMTALA requires a hospital with an emergency department to provide "an appropriate medical screening examination" to any individual who "comes to the emergency department" with a request to be examined or treated for a medical condition. 42 U.S.C. § 1395dd(a). The court of appeals concluded that this EMTALA requirement did not apply to Bridon because he arrived at Meriter through the birthing center, not the emergency room. *Preston*, 271 Wis. 2d 721, ¶¶ 37, 39. We must resolve whether the EMTALA screening requirement applies to an infant born in a hospital birthing center. Specifically, we must interpret whether the statutory phrase "comes to the emergency department" requires a baby to be born in a hospital emergency room for the EMTALA screening requirement to apply.

¶ 3.  Preston argues that the court of appeals' narrow interpretation of § 1395dd(a) is not consistent with the intent of EMTALA, and that a hospital's emergency department encompasses its birthing center. Thus, Meriter had a duty to screen Bridon. Conversely, Meriter argues that EMTALA does not impose a duty to screen a newborn presented in the birthing center, because the birthing center is not "the emergency department" and because, in Bridon's case, he was an "inpatient," to whom the EMTALA screening requirement does not apply.

¶ 4.  We agree with Preston with respect to the hospital's duty to screen.[3] Based on the allegations in the complaint, Meriter had a duty to give Bridon an appropriate screening examination to determine whether he had an emergency medical condition. When

---

[3] On the question of Bridon's alleged status as an "inpatient," see *infra* n.12.

271

a baby is born in a hospital birthing center, the newborn has come to the emergency department for purposes of the EMTALA duty to provide a medical screening examination. Because the court of appeals interpreted EMTALA differently, we reverse.

¶ 5.   This case involves a grant of summary judgment by the circuit court. However, the court of appeals reviewed Meriter's motion on Preston's EMTALA screening claim as if it were a motion to dismiss rather than a summary judgment motion. Here, our review is de novo, whether we apply the methodology appropriate for review where summary judgment has been granted or the methodology for review where a motion to dismiss has been granted, benefiting as usual from the analyses of the circuit court and the court of appeals. Under these circumstances, we will review the Meriter motion on the EMTALA screening claim in a manner similar to that of the court of appeals. Consequently, we decide merely whether the requirement of EMTALA, that any individual who "comes to the emergency department" of a hospital must be provided appropriate medical screening, applies to an infant born in an emergency medical condition at a hospital's birthing facility. We do not decide whether Meriter's response to Bridon's presence satisfied its duty to provide an appropriate medical screening examination.

## I. FACTS AND PROCEDURAL HISTORY

¶ 6.   Preston arrived at Meriter Hospital in Madison on November 9, 1999, at 5:33 p.m. She was 23-and-2/7ths weeks pregnant and had leaked amniotic fluid for a number of days. At the time of her hospitalization, Preston was unemployed and on Medical Assistance.

¶ 7.   Preston was admitted to the hospital and taken to the birthing center. There, physicians per-

formed an ultrasound to evaluate the unborn child's condition. At 3:55 a.m. the following morning, Preston gave birth to a son whom she named Bridon Michael Johnson. The child weighed 700 grams. The hospital staff made no attempt to prolong the baby's life, and Bridon died two-and-a-half hours later.

¶ 8. Preston's complaint alleged the following:

. . . .

4. On November 10, 1999 Plaintiff, Shannon Preston, gave birth on an emergency basis to Plaintiffs' decedent, Bridon Michael Johnson while an inpatient at Defendant Meriter Hospital, Inc.

5. Following the birth of the minor child, Defendant Meriter Hospital, Inc.'s employees and agents were aware of the birth of the child and aware of his emergent need of medical care, but failed, refused, and neglected to provide any care whatsoever to the newborn infant, who was at a gestational age of 23 and 2/7th weeks, weighed one and one half pounds, and was 13 inches in length.

6. Defendant Meriter Hospital, Inc. and its employees knew, that without at a minimum resuscitation and the administration of oxygen and fluids, that the infant child had virtually no medical chance to survive, but nevertheless intentionally withheld all treatment for the infant child who therefore died after two and one half hours of life.

. . . .

14. The conduct of the Defendant Meriter Hospital, Inc. and its employees was in violation of 42 U.S.C. § 1395dd.

15. Plaintiffs Bridon Michael Johnson and Shannon Preston were discriminated against and refused

treatment because they lacked private health insurance, contrary to 42 U.S.C. § 1395dd. . . .

Paragraphs 14 and 15 were printed under the heading "EMTALA CLAIM."

¶ 9. Preston sued Meriter for (1) medical negligence; (2) failure to obtain informed consent; and (3) neglect of a patient, contrary to Wis. Stat. § 940.295(1)(j)1. (1997–98),[4] in addition to (4) violation of EMTALA. The Dane County Circuit Court, Stuart A. Schwartz, Judge, granted Meriter summary judgment on all four of Preston's claims. The circuit court dismissed Preston's medical malpractice claim for failure to identify an expert witness. It dismissed her claim for patient neglect because Wis. Stat. § 940.295(1)(j)1. is part of the criminal code and does not create a private cause of action. It dismissed her informed consent claim because such claims cannot be brought against a hospital. It also dismissed her EMTALA claim.

¶ 10. Following Meriter's motion for summary judgment, the court received additional evidence. The court was told that Meriter physicians had determined, based on the prebirth ultrasound, that Bridon's lungs were so underdeveloped that he would likely die shortly after being born. The court was told health care personnel made observations of Bridon shortly after his birth and assigned Bridon an Apgar score of one.[5] Based

---

[4] All references to the Wisconsin Statutes are to the 1997–98 edition, unless otherwise stated.

[5] The Apgar score is an "evaluation of a newborn infant's physical status by assigning numerical values (0 to 2) to each of five criteria: heart rate, respiratory effort, muscle tone, response to stimulation, and skin color. A score of 10 indicates the best possible condition." *Stedman's Medical Dictionary* 1264 (4th Unabridged Lawyers' ed. 1976).

on this information and because Preston did not particularize her EMTALA claim, the court interpreted the claim as one of failing to stabilize the medical condition of an individual who comes to the hospital, in violation of 42 U.S.C. § 1395dd(b). The court stated: "Preston's complaint focuses on the hospital's failure to treat/resuscitate Bridon immediately after his birth. This allegation appears to implicate the EMTALA's stabilization requirement and not the screening requirement." The court reached this conclusion at least in part because Preston stated in a brief to the court that:

> There are many obligations under the EMTALA statute including an obligation to stabilize severely ill people before transferring them or discharging them, as well as mandated uniform methods for screening patients in emergency rooms et. al. None of those requirements is a consideration in the *Preston* case, *since we are only claiming that Meriter Hospital failed to stabilize* an acutely ill newborn, Bridon Johnson.

(Emphasis added.) This statement to the court supplies the basis for Meriter's argument that Preston waived any claim that Meriter failed to provide an appropriate medical screening examination.

¶ 11.   Although the circuit court granted summary judgment to Meriter on the hospital's motion, it focused on EMTALA's stabilization requirement and did not rule directly on a claim that Meriter violated EMTALA's screening requirement. The court of appeals reviewed Preston's screening claim pursuant to the motion-to-dismiss methodology. *Preston,* 271 Wis. 2d 721, ¶ 30 ("We consider the facts pled true and construe inferences from the pleadings in favor of the party against whom the motion is brought.").

275

¶ 12. As noted previously, because our review is de novo, whether we apply the methodology appropriate for review where summary judgment has been granted or the methodology for review where a motion to dismiss has been granted, we will review the circuit court's grant of summary judgment on Preston's screening claim as if it were decided on a motion to dismiss. *See Johnson v. Rogers Mem'l Hosp., Inc.*, 2001 WI 68, ¶ 10 n.3, 244 Wis.2d 364, 627 N.W.2d 890 (noting that although the defendant moved for summary judgment, because the circuit court decided the case as a motion to dismiss, we review the motion in a similar manner).

## II. STANDARD OF REVIEW

¶ 13. This case requires us to review the dismissal of part of a complaint for failure to state a claim upon which relief can be granted. Whether a complaint states a claim is a question of law that we review de novo. *Beloit Liquidating Trust v. Grade,* 2004 WI 39, ¶ 17, 270 Wis. 2d 356, 369, 677 N.W.2d 298. For purposes of determining whether a complaint is legally sufficient, we: (1) accept all facts pleaded as true; (2) derive all reasonable inferences from those facts; and (3) construe those facts and inferences in the light most favorable to the plaintiff. Thus, a court properly grants a motion to dismiss only if it is clear that "a plaintiff cannot recover under any circumstances." *Id.; see Johnson,* 244 Wis. 2d 364, ¶ 15.

¶ 14. To decide whether Preston's complaint states an EMTALA claim for which relief can be granted, we must interpret a federal statute. Statutory

interpretation is a question of law that we review de novo. *Seider v. O'Connell,* 2000 WI 76, ¶ 26, 236 Wis. 2d 211, 612 N.W.2d 659.

## III. ANALYSIS

¶ 15. Before considering the substance of Preston's EMTALA claim, we digress briefly into the realm of waiver.

### A. Waiver

¶ 16. Waiver is the "voluntary and intentional relinquishment of a known right." *Milas v. Labor Ass'n of Wis., Inc.,* 214 Wis. 2d 1, 9, 571 N.W.2d 656 (1997). The general rule is that a party waives a claim that is "neither pleaded nor argued to the trial court," and such a claim will not be considered on appeal. *Stern v. Credit Bureau of Milwaukee,* 105 Wis. 2d 647, 654–55, 315 N.W.2d 511, 515–16 (Ct. App. 1981). There are exceptions to this rule. Thus, when an issue involves a question of law, has been briefed by the opposing parties, and is of sufficient public interest to merit a decision, this court has discretion to address the issue. *Apex Elecs. Corp. v. Gee,* 217 Wis. 2d 378, 384, 577 N.W.2d 23 (1998). Waiver is merely a rule of "administration and does not involve the court's power to address the issues raised." *Wirth v. Ehly,* 93 Wis. 2d 433, 444, 287 N.W.2d 140 (1980).

¶ 17. Although Preston's statements to the court arguably support the conclusion that Preston waived her EMTALA claim for failure to screen, we will exercise our discretion to consider the merits of this dispute.

This case fits squarely within the exception to waiver: (1) the interpretation of the statutory phrase "comes to the emergency department" is a question of law; (2) both parties have fully briefed this issue before the court of appeals and this court; and (3) the determination of a hospital's duty to screen newborn infants is of sufficient public interest to warrant review. In addition, the court of appeals has addressed the issue in a published opinion. *Preston,* 271 Wis. 2d 721.

B.   Interpretation of EMTALA

¶ 18.   The parties dispute the meaning of the phrase "comes to the emergency department" in 42 U.S.C. § 1395dd(a). In its entirety, this subsection states:

(a) Medical screening requirement

In the case of a hospital that has a hospital emergency department, if any individual (whether or not eligible for benefits under this subchapter) comes to the emergency department and a request is made on the individual's behalf for examination or treatment for a medical condition, the hospital must provide for an appropriate medical screening examination within the capability of the hospital's emergency department, including ancillary services routinely available to the emergency department, to determine whether or not an emergency medical condition (within the meaning of subsection (e)(1) of this section) exists.

42 U.S.C. 1395dd(a) (emphasis added).

¶ 19.   Preston argues that the phrase comes to the emergency department implies a duty to screen any time an individual arrives at a place in a hospital with the capacity to respond to a request for emergency

278

medical care. Meriter takes the position that the phrase comes to the emergency department means that it has a duty to screen only when an individual arrives at an identified location. It points to the distinction between the phrase comes to the emergency department in 1395dd(a) and the phrase comes to the hospital in 1395dd(b), and asks how the two phrases can mean the same thing. Preston's interpretation of emergency department is functional. Meriter's definition of emergency department is spatial.

¶ 20. A statute is not ambiguous simply because the parties disagree as to its meaning. *State ex rel. Kalal v. Circuit Court for Dane County*, 2004 WI 58, 47, 271 Wis. 2d 633, 681 N.W.2d 110; *Seider*, 236 Wis. 2d at 227. Rather, a statute is ambiguous if reasonable people can understand it in more than one way. *Kalal*, 271 Wis. 2d 633, 47. Analysis of statutory ambiguity begins with the statutory language itself. *Id.*, 45; *Keup v. DHFS*, 2004 WI 16, 17, 269 Wis. 2d 59, 75, 675 N.W.2d 755. When the statutory language is clear and unambiguous, we do not look beyond the plain words, although legislative history may be consulted to confirm or verify a plain-meaning interpretation. *Kalal*, 271 Wis. 2d 633, 45, 51. If statutory language is ambiguous after considering the statute's plain words as well as its intrinsic scope, context, and purpose, then we may use relevant extrinsic sources, including administrative regulations and legislative history to ascertain the legislatively intended meaning. *Keup*, 269 Wis. 2d 59, 13–17; *see Kalal*, 271 Wis. 2d 633, 50–51.

¶ 21. The text of 1395dd(a) does not lead us inexorably to either a spatial or functional interpretation of emergency department. Both interpretations are reasonable. On one hand, emergency department may be

synonymous with emergency room, suggesting a spatial definition. If we were to apply Meriter's proposed definition of emergency department, the Meriter birthing center would not be encompassed by the term, and Meriter would have no EMTALA duty to Bridon under 1395dd(a). On the other hand, a department may also denote a division that specializes in a particular product, service, or field of knowledge. *See American Heritage Dictionary of the English Language* 501 (3d ed. 1992). This latter interpretation implicates any area of the hospitalnot just the emergency roomthat routinely supplies care for an emergency medical condition.[6] If we were to apply Preston's definition of emergency department, a birthing center would be encompassed by the term, since it specializes in treating the emergency medical conditions common to premature infants.

---

[6] The EMTALA defines an emergency medical condition as:

(A) a medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain) such that the absence of immediate medical attention could reasonably be expected to result in—

(i) placing the health of the individual (or, with respect to a pregnant woman, the health of the woman or her unborn child) in serious jeopardy,

(ii) serious impairment to bodily functions, or

(iii) serious dysfunction of any bodily organ or part; or

(B) with respect to a pregnant wom[a]n who is having contractions—

(i) that there is inadequate time to effect a safe transfer to another hospital before delivery, or

(ii) that transfer may pose a threat to the health or safety of the woman or the unborn child.

42 U.S.C. § 1395dd(e)(1).

280

¶ 22. We do not agree with Meriter that comparing the differing phrases in 1395dd(a) and (b) makes the phrase comes to the emergency department in subsection (a) clear and unambiguous. Even Meriter's counsel was unable to delineate the boundaries of Meriter's emergency department, especially when pressed on ancillary services. Acknowledging a distinction between the emergency department and the hospital does not lead to the conclusion that emergency department means the emergency room.

¶ 23. Because conflicting interpretations of comes to the emergency department are reasonable, we must look to extrinsic sources for guidance in determining the legislative intent of the statute. *See Kalal,* 271 Wis. 2d 633, 50 (Wisconsin courts ordinarily do not consult extrinsic sources of statutory interpretation unless the language of the statute is ambiguous.).

1. Legislative History

¶ 24. Congress enacted EMTALA in 1986 in response to reports that hospitals were refusing to treat patients who did not have medical insurance. 100 Stat. 82 (1986); H.R. Rep. No. 241, 99th Cong., 1st Sess., pt. 1, at 27 (1985). Courts and commentators commonly refer to EMTALA as the Anti-Patient Dumping Act. *See e.g., Baber v. Hosp. Corp. of Am.,* 977 F.2d 872, 873 n.1 (4th Cir. 1992). Patient dumping refers to a hospital's refusal to treat indigent and uninsured patients, thereby necessitating either formal or informal transfers of individuals from private to public hospitals. *Burks v. St. Joseph's Hosp.,* 227 Wis. 2d 811, 817, 596 N.W.2d 391 (1999). An underlying purpose of EMTALA, therefore, is to provide an 'adequate first response to a medical crisis' for all patients. *Baber,* 977 F.2d at 880

(quoting 131 Cong. Rec. S13904 (Oct. 23, 1985) (statement of Sen. Durenberger)).

¶ 25. The emphasis in the legislative history on ensuring emergency medical treatment for all individuals favors Preston's interpretation of "comes to the emergency department." A United States District Court in Virginia, though addressing EMTALA's stabilization requirement, captured the essence of Preston's position when it said:

> [T]he rationale behind the COBRA patient anti-dumping statute is not based upon the door of the hospital through which a patient enters, but rather upon the notion of proper medical care for those persons suffering medical emergencies, whenever such emergencies occur at a participating hospital. Indeed, it is a ridiculous distinction, one which places form over substance, to state that the care a patient receives depends on the door through which the patient walks.

*McIntyre v. Schick,* 795 F. Supp. 777, 781 (E.D. Va. 1992).

2. Implementing Regulations

¶ 26. Regulations interpreting EMTALA further support our conclusion that the proper interpretation of § 1395dd(a) requires a hospital to provide an emergency medical screening examination to an individual requesting emergency care, regardless of where he or she presents in the hospital.

¶ 27. Congress expressly charged the Department of Health and Human Services (DHHS) with enforcing EMTALA. *See* 42 U.S.C. § 1395dd(d).[7] DHHS promul-

---

[7] The Secretary of DHHS may impose civil money penalties of up to $50,000 upon a hospital for each EMTALA violation. 42 U.S.C. § 1395dd(d)(1)(A) (directing enforcement pursuant to 42

gated regulations in 1994 that were in effect in 1999 at the time of Bridon's birth. These regulations define the phrase "comes to the emergency department" to mean: "with respect to an individual requesting examination or treatment, that the individual is on the *hospital property* (property includes ambulances owned and operated by the hospital, even if the ambulance is not on hospital grounds)." 42 C.F.R. § 489.24(b) (1999) (emphasis added).[8]

¶ 28. We review DHHS's construction of § 1395dd(a) in accordance with *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837 (1984). *See St. Anthony Hosp. v. United States Dep't of Health & Human Servs.,* 309 F.3d 680, 691–92 (10th Cir. 2002) (applying *Chevron* deference to DHHS enforcement of EMTALA); *Arrington v. Wong,* 237 F.3d 1066, 1070–72 (9th Cir. 2001) (applying *Chevron* deference to DHHS interpretation of EMTALA).

¶ 29. Under *Chevron,* the determination of the proper deference to afford an agency interpretation is a two-step process. 467 U.S. at 842–43. First, a court must determine whether the statute is ambiguous. *Id.* at 842. If the statute is unambiguous and "Congress has directly spoken to the precise question at issue," both the

U.S.C. § 1320a-7a; *see* 42 U.S.C. § 1320a-7a(c)(1) ("The Secretary may initiate a proceeding to determine whether to impose a civil money penalty, assessment, or exclusion under subsection (a) or (b) of this section only as authorized by the Attorney General pursuant to procedures agreed upon by them.").

[8] DHHS has the authority to make and publish regulations to interpret and enforce the EMTALA pursuant to 42 U.S.C. § 1302.

All references to the Code of Federal Regulations are to the 1999 edition, unless otherwise stated.

court and the agency must give effect to the clearly expressed intent of Congress. *Id.* at 842–43. Only if a statute is ambiguous or silent on the precise question does a court reach the second step. *Id.* In the second step, the inquiry shifts to whether the agency interpretation is "a permissible construction of the statute." *Id.* at 843.

¶ 30.  Courts employ one of two tests to determine whether an agency interpretation is permissible. If Congress expressly delegated rule-making authority to an agency, the agency's interpretation is permissible unless it is "procedurally defective, arbitrary or capricious in substance, or manifestly contrary to the statute." *United States v. Mead Corp.,* 533 U.S. 218, 227 (2001); *see also Chevron,* 467 U.S. at 843–44. Alternatively, if Congress impliedly delegated authority to an agency, the agency's interpretation is permissible unless it is unreasonable. *Id.* at 844; *Mead Corp.,* 533 U.S. at 229.

¶ 31.  Since Congress expressly delegated to DHHS the authority to make and publish rules concerning EMTALA, and because EMTALA provides no definition for the phrase "comes to the emergency department," we must give DHHS's definition of "comes to the emergency department" controlling weight unless it is arbitrary or capricious. *See Chevron,* 467 U.S. at 844.

¶ 32.  Under the "arbitrary and capricious" standard, the scope of review "is narrow and a court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43 (1983). A regulation may be arbitrary or capricious if:

[T]he agency [1] has relied on factors which Congress has not intended it to consider, [2] entirely failed to consider an important aspect of the problem, [3] offered an explanation for its decision that runs counter to the evidence before the agency, or [4] is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Id.; Prometheus Radio Project v. Fed. Communications Comm'n,* 373 F.3d 372, 390 (3d Cir. 2004); *Arent v. Shalala,* 70 F.3d 610, 616 (D.C. Cir. 1995). However, if the agency can satisfactorily explain its regulatory decision and if there is "a rational connection between the facts found and the choice made," a court should defer to the agency. *See Motor Vehicle Mfrs.,* 463 U.S. at 43.

¶ 33. We conclude that the regulation defining "comes to the emergency department" is not arbitrary and capricious for several reasons.

¶ 34. First, DHHS drafted proposed regulations and solicited public comments, allowing it to take into consideration any objections from interested parties.[9]

---

[9] DHHS solicited comments after publishing its proposed definition of "comes to the emergency department" in 1994, and has periodically reviewed this definition. *See* 59 Fed. Reg. 32,098, 32,101 (June 22, 1994) (setting forth the comments received in response to the first regulations interpreting EMTALA and DHHS's responses to those comments); 65 Fed. Reg. 18,522–23 (April 7, 2000) (reconsidering and rejecting a comment that the screening requirement of § 1395dd(a) be restricted to individuals who present to an emergency room); 67 Fed. Reg. 31,472–76 (May 9, 2002) (explaining a proposed rule to clarify the definition of "comes to the emergency department"); 68 Fed. Reg. 53,227–44 (Sept. 9, 2003) (setting forth the comments received in response to the proposed clarifications to the definition of "comes to the emergency department" and DHHS's responses to those comments).

In the course of this notice-and-comment history, DHHS satisfactorily explained why it defined "emergency department to be coextensive with hospital property." Two explanations stand out: (1) DHHS deemed a functional definition of "emergency department" necessary to impose EMTALA duties upon hospitals that may not have a formally labeled emergency department or emergency room, *see* 59 Fed. Reg. 32,101;[10] and (2) DHHS concluded that a narrowly drawn definition would thwart the primary objective of EMTALA: to ensure that those in need of emergency care receive it. *See id.* at 32,098.

¶ 35.   Second, although DHHS has refined its definition of "comes to the emergency department," the agency has consistently defined the phrase to include all hospital property. *Compare* 42 C.F.R. § 489.24(b) (1999) *with* 42 C.F.R. § 489.24(b) (2004).[11] DHHS's

---

[10] During oral argument, Meriter's attorney had difficulty pinning down exactly what constituted the Meriter emergency department. This imprecision underscores the wisdom of this regulation.

[11] The relevant portion of the 1999 regulations defines "comes to the emergency department" as:

> [W]ith respect to an individual requesting examination or treatment that the individual *is on the hospital property* (property includes ambulances owned and operated by the hospital, even if the ambulance is not on hospital grounds). . . .

42 C.F.R. § 489.24(b) (1999) (emphasis added).

The relevant portion of the 2004 regulations defines "comes to the emergency department" as:

> [W]ith respect to an individual who is not a patient (as defined in this section), the individual—
>
> (1) Has presented at a hospital's dedicated emergency department, as defined in this section, and requests examination or

adherence to the core concept that an emergency department extends to all hospital property, despite periodic reconsideration of the definition, demonstrates a carefully considered policy choice.

¶ 36.   Third, DHHS's interpretation advances the purpose of EMTALA. By broadly defining "comes to the emergency department," the regulation better ensures that all individuals in need of emergency care actually receive it. *See* 59 Fed. Reg. 32,098 (June 22, 1994) (noting that if the screening duty imposed by § 1395dd(a) depended upon where an individual entered a hospital, such an interpretation would "frustrate the objectives of the statute in many cases and lead to arbitrary results"). We conclude that there is a rational connection between defining "comes to the emergency department" to include the entire hospital property and the primary EMTALA objective of ensuring access to emergency medical treatment. *See e.g., Individual Reference Svcs. Group, Inc. v. Fed. Trade Comm'n,* 145 F. Supp. 2d 6, 31 (D.D.C. 2001) (noting

> treatment for a medical condition, or has such a request made on his or her behalf. In the absence of such a request by or on behalf of the individual, a request on behalf of the individual will be considered to exist if a prudent layperson observer would believe, based on the individual's appearance or behavior, that the individual needs examination or treatment for a medical condition;
>
> (2) *Has presented on hospital property,* as defined in this section, other than the dedicated emergency department, and requests examination or treatment for what may be an emergency medical condition, or has such a request made on his or her behalf. In the absence of such a request by or on behalf of the individual, a request on behalf of the individual will be considered to exist if a prudent layperson observer would believe, based on the individual's appearance or behavior, that the individual needs emergency examination or treatment.

42 C.F.R. § 489.24(b) (2004) (emphasis added).

that the regulation at issue was not arbitrary and capricious since it was consistent with and promoted the policy of the underlying statute).

¶ 37.   Finally, the DHHS regulation is not "manifestly contrary to the statute." When a statute is ambiguous, "an agency's interpretation cannot, by definition, be found to directly contravene it." *Hagen v. LIRC,* 210 Wis.2d 12, 21, 563 N.W.2d 454 (1997) (quoting *Harnischfeger Corp. v. LIRC,* 196 Wis. 2d 650, 662, 539 N.W.2d 98 (1995)).

¶ 38.   For these reasons, we conclude that the proper interpretation of "comes to the emergency department" in this case imposes a duty upon a hospital to provide a medical screening examination to a newborn who (1) presents to the emergency room of the hospital or (2) is born in the birthing center of the hospital and otherwise meets the conditions set forth in 42 C.F.R. § 489.24(b) (1999).

C.   Whether Preston's § 1395dd(a) Claim Should Have Been Dismissed

¶ 39.   Taking the facts pleaded as true, we conclude that Preston's complaint states a claim upon which relief can be granted, namely, a violation of the screening requirement in 42 U.S.C. § 1395dd(a). The complaint alleged that Bridon was born [in the birthing center] at Meriter Hospital and that hospital employees and agents allegedly failed and "refused . . . to provide any care whatsoever to the newborn infant." These employees must have been asked to provide care if they allegedly "refused" to provide care. The alleged failure to provide care implicitly included the failure to provide

288

an appropriate medical screening examination. All this occurred in a major hospital in a place with the capacity to respond to a request for emergency care, a place well within the then-existing definition of "emergency department" in 42 C.F.R. § 489.24(b) (1999). The complaint alleges that Meriter not only failed to provide an appropriate medical screening examination but also did so because Shannon Preston and Bridon Johnson lacked private health insurance.[12]

¶ 40.  The circuit court's dismissal of Preston's failure to screen claim requires us to reverse. The circuit court's action is understandable but unsustainable in the wake of the court of appeals' discussion of the issue.

¶ 41.  We wish to emphasize that we do not decide whether Meriter's response to Bridon's presence in the birthing facility satisfied its duty to provide an appropriate medical screening examination. The circuit court will have to resolve the scope of the EMTALA duty to screen and whether Meriter discriminated against Bridon in the way it conducted any screening examination.

## IV. CONCLUSION

¶ 42.  We conclude that the court of appeals misinterpreted the phrase "comes to the emergency depart-

---

[12] Meriter raises the argument that EMTALA does not apply to Bridon because he was admitted to Meriter as an inpatient. Since we are reviewing this matter as if a motion to dismiss had been granted, we have considered only whether the facts and inferences in the complaint state a claim under EMTALA's screening requirement. Therefore, we disregard subsequent factual revelations and the legal conclusions that follow from those facts for purposes of this decision. Accordingly, based solely on the complaint, we hold that Preston has pleaded an EMTALA screening claim.

ment" in 42 U.S.C. § 1395dd(a). Because of this misinterpretation, the court of appeals erroneously concluded that Meriter owed Bridon no EMTALA screening duty because he presented to the birthing center rather than the emergency room of the hospital. The duty to provide a medical screening examination should not depend upon the hospital room—be it the emergency room, the birthing center, or an operating room—into which a baby is born. The court of appeals decision affirming the decision of the circuit court is reversed, and this case is remanded to the circuit court for action consistent with this opinion.

*By the Court.*—The decision of the court of appeals is reversed and the cause is remanded to the circuit court.

¶ 43. N. PATRICK CROOKS, J. (*concurring*). While I join the majority opinion, I write to address that portion of the dissent that addresses the issue of whether or not Bridon was an inpatient for purposes of EMTALA.

¶ 44. The majority did not address that issue. *See* majority op., ¶ 39 n.12. While the dissent suggests a roadmap for such a determination, it is merely the opinion of one justice. The issue of whether a newborn infant is considered an inpatient upon his or her mother's admission to a hospital has yet to be determined by this, or to our knowledge any other, court. The question is complicated further by the circumstances of this case, in which the hospital never intended to, nor did it, provide any treatment to Bridon. As the court of appeals' decision is reversed, and this case is remanded to the circuit court for further proceedings, the parties should fully brief this issue for the circuit court's consideration.

¶ 45. For the above stated reason, I respectfully concur.

¶ 46. I am authorized to state that Chief Justice SHIRLEY S. ABRAHAMSON and Justices ANN WALSH BRADLEY and LOUIS B. BUTLER, JR. join this concurrence.

¶ 47. PATIENCE DRAKE ROGGENSACK, J. (*dissenting*). The majority errs in its review of the Emergency Medical Treatment and Active Labor Act (EMTALA) screening claim by concluding that Preston's complaint[1] states a claim upon which relief can be granted, as did the court of appeals, because its analysis of EMTALA overlooks Bridon's status as an inpatient.[2] I conclude that the screening provision of EMTALA, 42 U.S.C. § 1395dd(a) (1994),[3] does not apply to hospital inpatients. Because Bridon became an inpatient when his mother was admitted before his birth, the screening provision of EMTALA does not apply to him. Therefore, because I would affirm the court of appeals decision dismissing Preston's claim, albeit on different grounds, I respectfully dissent.

---

[1] I refer to Shannon Preston, Charles Johnson and the estate of Bridon Michael Johnson collectively as "Preston," unless otherwise noted.

[2] The dismissal of "all claims" at the circuit court was upon a motion for summary judgment. As a determination of whether the complaint states a claim, the first step in a summary judgment analysis, *Brownelli v. McCaughtry,* 182 Wis. 2d 367, 372, 514 N.W.2d 48 (Ct. App. 1994), I begin by examining the complaint. This is where the court of appeals stopped in its analysis, as does the majority opinion. *See* majority op., ¶¶ 5, 12, 39 n.12. However, we are not confined to the four corners of the complaint, as we review the summary judgment the circuit court granted.

[3] All subsequent citations to the United States Code are to the 1994 version unless otherwise noted.

## I. DISCUSSION

A. Standard of Review

¶ 48. We review a circuit court's decision granting summary judgment independently, but we apply the same methodology as the circuit court. *Mrozek v. Intra Fin. Corp.*, 2005 WI 73, ¶ 14, 281 Wis.2d 448, 699 N.W.2d 54 (citing *Smaxwell v. Bayard*, 2004 WI 101, ¶ 12, 274 Wis. 2d 278, 682 N.W.2d 923). Pursuant to Wis. Stat. § 802.08(2), summary judgment "shall be rendered if the pleadings, depositions, answers to inter-rogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."

¶ 49. As our first step in a summary judgment analysis, we determine whether Preston's complaint states an EMTALA claim for which relief can be granted. *See Brownelli v. McCaughtry*, 182 Wis. 2d 367, 372, 514 N.W.2d 48 (Ct. App. 1994). We then examine the answer to determine whether an issue of material fact or law is disputed. *Id.* If issue has been joined, we then look to the moving party's affidavits to determine whether that party has made a prima facie case for summary judgment. *Id.* If it has, we look to the oppos-ing party's affidavits to determine whether there are any material facts in dispute that entitle the opposing party to a trial. *Id.* at 372–73.

¶ 50. As part of this summary judgment analysis, we must interpret the EMTALA statute, 42 U.S.C. 1395dd. Statutory interpretation is a question of law that we review de novo. *Columbus Park Hous. Corp. v. City of Kenosha*, 2003 WI 143, ¶ 9, 267 Wis. 2d 59, 671 N.W.2d 633. When we interpret or apply a statute, we

attempt to ascertain its meaning in order to give the statute its full intended effect. *State ex rel. Kalal v. Circuit Court for Dane County,* 2004 WI 58, ¶ 44, 271 Wis. 2d 633, 681 N.W.2d 110. We begin with the words chosen by the legislature, giving them their plain and ordinary meanings. *Id.,* ¶ 45. This is our initial focus, because as we have explained, "[w]e assume that the legislature's intent is expressed in the statutory language." *Id.,* ¶ 44. We are aided in ascertaining the meaning of a statute by the context in which words are placed. *Id.,* ¶ 46. If the statute's meaning is clear on its face, we need go no further; we simply apply it. *Id.,* ¶ 45. However, if the statutory language is capable of being understood by reasonably well-informed persons in two or more ways, then it is ambiguous. *Bruno v. Milwaukee County,* 2003 WI 28, ¶ 19, 260 Wis. 2d 633, 660 N.W.2d 656. A statute may also be ambiguous due to its interactions with other statutes. *State v. White,* 97 Wis. 2d 193, 198, 295 N.W.2d 346 (1980). If the statutory language is ambiguous, we may consult extrinsic sources to ascertain legislative intent. *Stockbridge Sch. Dist. v. Department of Pub. Instruction Sch. Dist. Boundary Appeal Bd.,* 202 Wis. 2d 214, 223, 550 N.W.2d 96 (1996).

B.   Preston's Claim

¶ 51.   The claim at issue here is Preston's claim against Meriter under the screening requirement of EMTALA, 42 U.S.C. 1395dd(a). That provision states:

Medical screening requirement. In the case of a hospital that has a hospital emergency department, if any individual (whether or not eligible for benefits under this subchapter [42 USCS §§ 1395 et seq.]) comes to the emergency department and a request is made on the individual's behalf for examination or treatment for a

medical condition, the hospital must provide for an appropriate medical screening examination within the capability of the hospital's emergency department, including ancillary services routinely available to the emergency department, to determine whether or not an emergency medical condition (within the meaning of subsection (e)(1)) exists.

¶ 52.   The majority's discussion of the screening requirement is focused on the meaning of the language "comes to the emergency department" found in 42 U.S.C. 1395dd(a). The majority concludes that:

the proper interpretation of "comes to the emergency department" in this case imposes a duty upon a hospital to provide a medical screening examination to a newborn who (1) presents to the emergency room of the hospital or (2) is born in the birthing center of the hospital and meets the conditions set forth in 42 C.F.R. § 489.24(b) (1999).

Majority op., ¶ 38. The majority further explains that in 42 C.F.R. § 489.24(b), the Department of Health and Human Services (DHHS) has consistently defined the phrase "comes to the emergency department" to include all hospital property. Majority op., ¶ 35. While I agree with the majority's conclusion about the meaning of "emergency department," the majority overlooks the dispositive issue in the present case, which is whether EMTALA applies to inpatients. Because, as I explain below, Bridon was an inpatient rather than someone who "comes to" the hospital, I conclude Preston's claim regarding Bridon falls outside the scope of EMTALA and instead sounds in Wisconsin's medical malpractice law.

¶ 53.   There have been no prior decisions directly addressing whether EMTALA's screening requirement applies to inpatients. However, it is only EMTALA's

screening requirement that is before us on this review. The dearth of cases is not surprising considering that most EMTALA claims do not implicate the unique attributes present in pregnancies, where essentially a "patient with a patient" arrives at the hospital, the expectant mother carrying the unborn child. However, court decisions and federal regulation[4] regarding EMTALA's stabilization and transfer requirements, 42 U.S.C. 1395dd(b)-(c),[5] shed light on the relation of EMTALA to inpatients.

---

[4] *See* 42 C.F.R. § 489.24 (2005), discussed below. All subsequent references to the Federal Register are to the 2005 version unless otherwise noted.

[5] In addition to the screening requirement at issue in the present case, EMTALA requires hospitals to stabilize the medical condition of patients arriving with an emergency medical condition or in active labor, 42 U.S.C. 1395dd(b), and restricts the transfer of unstabilized patients, 42 U.S.C. 1395dd(c). These provisions state:

>   (b) Necessary stabilizing treatment for emergency medical conditions and labor.

>   (1) In general. If any individual (whether or not eligible for benefits under this subchapter [42 USCS §§ 1395 et seq.]) comes to a hospital and the hospital determines that the individual has an emergency medical condition, the hospital must provide either—

>   (A) within the staff and facilities available at the hospital, for such further medical examination and such treatment as may be required to stabilize the medical condition, or

>   (B) for transfer of the individual to another medical facility in accordance with subsection (c) of this section.

>   . . . .

>   (c) Restricting transfers until individual stabilized.

>   (1) Rule. If an individual at a hospital has an emergency medical condition which has not been stabilized . . . the hospital may not transfer the individual unless [certain conditions are met].

¶ 54. Before the implementation of the DHHS regulation, jurisdictions were split as to whether the stabilization and transfer provisions of EMTALA applied to a patient once he or she was admitted to a hospital. In *Thornton v. Southwest Detroit Hospital,* 895 F.2d 1131, 1132 (6th Cir. 1990), a patient suffered a stroke, arrived at the hospital's emergency room and spent 10 days in the hospital's intensive care unit and 11 more days in regular inpatient care before being discharged to her sister's home for basic nursing care. The patient brought an action under the stabilization requirement of EMTALA, alleging that the hospital failed to stabilize her before discharging her. *Id.* The hospital argued that the stabilization requirement did not apply once a patient was admitted to the hospital. *Id.* at 1135. The Sixth Circuit Court of Appeals disagreed, stating:

> Although emergency care often occurs, and almost invariably begins, in an emergency room, emergency care does not always stop when a patient is wheeled from the emergency room into the main hospital. Hospitals may not circumvent the requirements of the Act merely by admitting an emergency room patient to the hospital, then immediately discharging that patient. Emergency care must be given until the patient's emergency medical condition is stabilized.

*Id.*

¶ 55. In *Lopez-Soto v. Hawayek,* 175 F.3d 170, 171 (1st Cir. 1999), the patient arrived at the hospital with normal labor pains. The patient was examined and admitted to the maternity ward, where the doctor ordered a cesarean section. *Id.* The patient gave birth to a baby boy who emerged with severe respiratory and pulmonary problems. *Id.* The infant was transferred to a hospital with a functioning neonatal intensive care

unit without first being stabilized, and he later died. *Id.* The patient brought an action under the stabilization and transfer provisions of EMTALA, arguing that the hospital did not stabilize the infant before transferring him, but the district court dismissed the claim on the ground that the newborn had come to the hospital via the operating room, and EMTALA applied only to entries via the emergency room. *Id.* at 172. The First Circuit Court of Appeals reversed, concluding that the stabilization and transfer requirements were not limited to entries via the emergency room:

> Congress obviously had a horizon broader than the emergency room in mind when it enacted EMTALA. The statute explicitly embraces women in labor, *see* 42 U.S.C. § 1395dd(e)(1)(B) (defining emergency medical condition)—yet most gravid women go to maternity wards, not emergency rooms, when they are ready to give birth.
>
> . . . Congress's preoccupation with patient dumping is served, not undermined, by forbidding the dumping of *any* hospital patient with a known, unstabilized, emergency condition. After all, patient dumping is not a practice that is limited to emergency rooms. If a hospital determines that a patient on a ward has developed an emergency medical condition, it may fear that the costs of treatment will outstrip the patient's resources, and seek to move the patient elsewhere. That strain of patient dumping is equally as pernicious as what occurs in emergency departments, and we are unprepared to say that Congress did not seek to curb it.

*Id.* at 176–77.

¶ 56.   However, other jurisdictions concluded that EMTALA's stabilization requirement did not apply to inpatients. In *Bryant v. Adventist Health System/West,* 289 F.3d 1162, 1164 (9th Cir. 2002), a patient sought

297

care at a hospital's emergency room after coughing up blood, and the doctor failed to detect a large lung abscess. The patient was discharged after being diagnosed with pneumonia and asthma, and the doctor requested he return the next day for further treatment. *Id.* The patient returned the following day, the lung abscess was detected and he was admitted to the hospital. *Id.* Within three days, the patient's condition declined rapidly, and he was transferred to another hospital, where he had surgery. *Id.* He later returned home and appeared to be improving, but died suddenly within 10 days of being discharged. *Id.* The patient's heirs filed an action alleging EMTALA violations concerning both the initial emergency room visit and the subsequent inpatient care. *Id.* Regarding the inpatient care, the Ninth Circuit Court of Appeals held that "the stabilization requirement normally ends when a patient is admitted for inpatient care." *Id.* at 1167. The court stated:

> The stabilization requirement is . . . defined entirely in connection with a possible transfer and without any reference to the patient's long-term care within the system. It seems manifest to us that the stabilization requirement was intended to regulate the hospital's care of the patient only in the immediate aftermath of the act of admitting her for emergency treatment and while it considered whether it would undertake longer-term full treatment or instead transfer the patient to a hospital that could and would undertake that treatment. It cannot plausibly be interpreted to regulate medical and ethical decisions outside that narrow context.

*Id.* (quoting *Bryan v. Rectors & Visitors of the Univ. of Va.,* 95 F.3d 349, 352 (4th Cir. 1996). The court discussed the *Thornton* and *Lopez-Soto* cases, but noted that because "Congress enacted EMTALA 'to create a new cause of action, generally unavailable under state

tort law, for what amounts to failure to treat' and not to 'duplicate preexisting legal protections' " and that state tort law provided for negligent medical care for inpatients, EMTALA should not apply. *Id.* at 1168–69 (quoting *Gatewood v. Washington Healthcare Corp.,* 933 F.2d 1037, 1041 (D.C. Cir. 1991). The court concluded, "If EMTALA liability extended to inpatient care, EMTALA would be 'converted . . . into a federal malpractice statute, something it was never intended to be.' " *Id.* at 1169 (quoting *Hussain v. Kaiser Found. Health Plan,* 914 F. Supp. 1331, 1335 (E.D. Va. 1996).

¶ 57.   The *Bryant* court also addressed the concern in *Thornton* that hospitals might be able to avoid liability under EMTALA by admitting and then refusing to treat patients. *See Thornton,* 895 F.2d at 1135. The court stated:

> We agree with the [*Thornton* court] that a hospital cannot escape liability under EMTALA by ostensibly "admitting" a patient, with no intention of treating the patient, and then discharging or transferring the patient without having met the stabilization requirement. In general, however, a hospital admits a patient to provide inpatient care. We will not assume that hospitals use the admission process as a subterfuge to circumvent the stabilization requirement of EMTALA. If a patient demonstrates in a particular case that inpatient admission was a ruse to avoid EMTALA's requirements, then liability under EMTALA may attach.

*Bryant,* 289 F.3d at 1169.

¶ 58.   Similarly, the court in *Dollard v. Allen,* 260 F. Supp. 2d 1127, 1135 (D. Wyo. 2003), ruled that the stabilization and transfer provisions of EMTALA do not apply to individuals admitted for inpatient care. In that case, the patient periodically visited her doctor for lower back pain and numbness in her buttocks. *Id.* at

1129. The problems continued and the patient was admitted to the hospital for pain management and rest. *Id.* After reporting that the back pain was not as severe, but the numbness had increased, the doctor discharged the patient. *Id.* at 1130. The next morning the patient began experiencing excruciating pain in her stomach and was unable to urinate. *Id.* She called the hospital and was readmitted under the care of a new doctor, who determined that the patient had a large ruptured disc in her back, as well as a rare neurological disorder affecting the lower end of the spinal cord. *Id.* The patient underwent lower-back surgery the day after she was admitted for the second time. *Id.* The patient filed suit alleging that the hospital violated the screening and stabilization before transfer requirements of EMTALA upon her first admission to the hospital. *Id.* at 1134. The court granted summary judgment to the hospital on the stabilization and transfer claim on two grounds, one being that the hospital "did not violate EMTALA's stabilization before transfer requirement because that provision does not apply to individuals that have been admitted to the hospital for in-patient care." *Id.* at 1135. The court stated that allowing EMTALA claims in inpatient situations, where state tort law applied, would "render[] the Act's preemption subsection superfluous." *Id.* The preemption provision, 42 U.S.C. 1395dd(f), states, "The provisions of this section do not preempt any State or local law requirement, except to the extent that the requirement directly conflicts with a requirement of this section." The court reasoned that because EMTALA's purpose is to eliminate " 'patient-dumping' " and not to " 'federalize medical malpractice,' " EMTALA does not apply in inpatient situations, where state tort law applies. *Dollard,* 260 F. Supp. 2d at 1135 (quoting *Ingram v. Muskogee Reg'l Med. Ctr.,* 235 F.3d 550, 552 (10th Cir. 2000).

¶ 59. In 2003, as a response to the questions raised by cases such as these, DHHS promulgated a rule "interpreting hospital obligations under EMTALA as ending once the individuals are admitted to the hospital inpatient care." Medicare Program; Clarifying Policies Related to the Responsibilities of Medicare-Participating Hospitals in Treating Individuals With Emergency Medical Conditions, 68 Fed. Reg. 53222, 53244–45 (September 9, 2003) [hereinafter "Clarifying Medicare Policies"]. The rule set out in 42 C.F.R. § 489.24 now states:

> Exception: Application to inpatients. (i) If a hospital has screened an individual under paragraph (a) of this section and found the individual to have an emergency medical condition, and admits that individual as an inpatient in good faith in order to stabilize the emergency medical condition, the hospital has satisfied its special responsibilities under this section with respect to that individual.

C. 42 C.F.R. § 489.24

¶ 60. Under *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842–44 (1984), 42 C.F.R. § 489.24 controls regarding the issue of whether EMTALA's stabilization requirement applies to inpatients. *Chevron* explains how courts are to review an agency's interpretation of a statute. *Chevron,* 467 U.S. at 842–44. First, we must determine whether the statute at issue is ambiguous regarding the question presented, here, whether EMTALA's requirements apply to inpatients. *Id.* at 842–43. If we conclude the statute is ambiguous or silent on the issue, our inquiry shifts to determine whether the agency's interpretation is "based on a permissible construction of the statute." *Id.* We employ one of two tests to make this determination. If Congress explicitly delegated rule-making au-

thority to the agency, then the agency's interpretation is "given controlling weight unless [it is] arbitrary, capricious, or manifestly contrary to the statute." *Id.* at 843–44; *see also United States v. Mead Corp.,* 533 U.S. 218, 227 (2001). If Congress implicitly delegated authority to the agency, the agency's interpretation controls so long as it is reasonable. *Chevron,* 467 U.S. at 844.

¶ 61.  Applying this analysis to the issue of whether EMTALA covers inpatients, I first note that EMTALA is silent as to this question.[6] Therefore, the inquiry shifts to a determination of whether the agency's interpretation in 42 C.F.R. § 489.24 is based on a permissible construction of EMTALA. I agree with the majority that Congress explicitly charged DHHS with the authority to make and publish regulations interpreting EMTALA.[7] 42 U.S.C. § 1302. Therefore, the interpretation in 42 C.F.R. § 489.24 controls, unless it is arbitrary, capricious or manifestly contrary to the statute.

¶ 62.  I conclude the regulation stating that EMTALA's stabilization requirement does not cover inpatients is not arbitrary, capricious, or manifestly contrary to the statute. DHHS drafted proposed regulations and solicited public comments to ensure discussion among interested parties regarding the inpatient issue. In the supplementary information included with the final rule, DHHS includes a lengthy discussion of the issue, including comments made by various parties and DHHS's responses. Clarifying Medicare Policies, *supra* ¶ 59, at 53243–48. DHSS thoroughly considered these comments, and in response to comments opposed

---

[6] As I discuss above, the consequences of this silence can be seen in courts' inconsistent application of EMTALA's stabilization requirement to inpatients.

[7] *See* majority op., ¶ 27 n.8.

to this proposed rule, as well as cases such as *Bryant,* DHHS ultimately decided to exclude coverage under EMTALA once a person was admitted to the hospital. *Id.* at 53244–48. Accordingly, DHHS's interpretation cannot be described as arbitrary or capricious.

¶ 63. Because the final regulation advances the purpose of EMTALA, it cannot be described as "manifestly contrary to the statute" either. As discussed in the *Bryant* and *Dollard* cases above, EMTALA was designed to "fill the gap" in legal liability for hospitals regarding the failure to treat emergency medical conditions. Given that medical malpractice liability deals with the quality of inpatient treatment, the regulation clarifying that inpatients are not covered by EMTALA merely eliminates possible overlap and retains the protection against "dumping" that EMTALA was created to implement. Therefore, because I conclude that the interpretation of EMTALA in 42 C.F.R. § 489.24 is permissible, it controls regarding whether the stabilization requirement of EMTALA applies to inpatients.

¶ 64. The reasoning that underlies DHHS's regulation in 42 C.F.R. § 489.24 applies equally to the screening provision of EMTALA. There is no principled basis to distinguish EMTALA coverage between screening and stabilization procedures for inpatients given that substandard care regarding screening would be subject to a medical malpractice claim just as a substandard effort to stabilize would be. Additionally, the screening requirement is the procedure used to assess whether one who comes to the emergency department should be admitted to the hospital. If the person is already admitted, the purpose that drives the screening requirement has already been met. There-

303

fore, I conclude that the screening provision of EMTALA does not apply once an individual becomes an inpatient.

¶ 65.   I further note that the DHHS regulation controls the present case even though the regulation was not passed until 2003. In *Smiley v. Citibank (South Dakota), N.A.,* 517 U.S. 735, 744 n.3 (1996), the United States Supreme Court responded to the argument that "deferring to the regulation in this case involving antecedent transactions would make the regulation retroactive." The Court stated:

> There might be substance to this point if the regulation replaced a prior agency interpretation—which, as we have discussed, it did not. Where, however, a court is addressing transactions that occurred at a time when there was no clear agency guidance, it would be absurd to ignore the agency's current authoritative pronouncement of what the statute means.

*Id.; see also Barnhart v. Walton,* 535 U.S. 212, 221 (2002) ("[Defendant] also asks us to disregard the Agency's interpretation of its formal regulations on the ground that the Agency only recently enacted those regulations, perhaps in response to this litigation. We have previously rejected similar arguments."). As was the case in *Smiley,* DHHS promulgated the regulation clarifying the status of inpatients under EMTALA to provide guidance where there had been none, as can be seen in the splits among the various jurisdictions regarding the inpatient issue that existed before the advent of the regulation.

¶ 66.   The final issue raised by this case is whether Bridon was an inpatient and therefore, is subject to the previous analysis. It is not disputed that Shannon Preston was admitted shortly after arriving at Meriter, and that she gave birth to Bridon while she was an

inpatient.[8] Preston's unborn child "came to the hospital" at the same time she did.

¶ 67.    Care for an unborn child is often required prior to birth, and in providing that care, the unborn child becomes a second inpatient. We have recently held that a pregnant woman and her unborn child are two inpatients during the course of delivery. *See Pierce v. Physicians Ins. Co. of Wis., Inc.*, 2005 WI 14, ¶ 12, 278 Wis. 2d 82, 692 N.W.2d 558 ("we have the unique situation where the patient, Bonnie Pierce, was also the parent of the patient, Brianna Lynn Marcks," who was stillborn). Further support for the contention that a child in utero is an inpatient is shown by the surgery that is performed on unborn children to treat such maladies as spina bifida and lung malformations. *See, e.g.,* Claudia Kalb & Mary Carmichael, *Treating the Tiniest Patients,* Newsweek, June 9, 2003, at 48; Maggie Jones, *A Miracle, and Yet,* N.Y. Times, July 15, 2001, § 6 (Magazine), at 39. An unborn child capable of being operated on is an inpatient just as is the mother who carries that child.

---

[8] Paragraph 4 of the complaint alleges that Shannon Preston gave birth "on an emergency basis" to Bridon "while an inpatient" at Meriter. Although Meriter's answer denies "knowledge or information sufficient to form a belief as to the truthfulness of the allegations contained in Paragraphs 1 and 4 of plaintiff's Complaint," this appears to be a denial to the "emergency basis" contention and not the claim that Shannon was an inpatient. Meriter's brief in support of its motion for summary judgment cites the complaint for the contention that Preston was an inpatient, and the affidavit of Peter J. Ouimet, the risk manager for Meriter, in support of motions for judicial determination and to stay discovery, states that Preston was "admitted to the hospital" at about 7:00 p.m. on November 9, 1999. Preston's medical records filed with the affidavit contain a "Nursing Admission Assessment" listing the time of admission as 7:00 p.m.

¶ 68.    In this case, Bridon received care before and after his birth. His medical records show that an ultrasound was performed to evaluate the condition of his lungs before he was born. In addition, Bridon's hospital records show he was resuscitated shortly after birth, his heart rate was monitored and he was scored twice, using APGAR.[9] Based on these undisputed facts of record, I conclude that Bridon became an inpatient when his mother did, and accordingly, the EMTALA screening requirement does not apply to him. Therefore, I would affirm the court of appeals dismissal of Preston's claim under 42 U.S.C. § 1395dd(a).

## II. CONCLUSION

¶ 69.    I conclude that the screening provision of EMTALA, 42 U.S.C. § 1395dd(a), does not apply to hospital inpatients. Because Bridon became an inpatient when his mother was admitted before his birth, the screening provision of EMTALA does not apply to him. Therefore, because I would affirm the court of appeals decision dismissing Preston's claim, albeit on different grounds, I respectfully dissent.

¶ 70.    I am authorized to state that Justice JON P. WILCOX joins this dissent.

---

[9] APGAR is a scoring mechanism that evaluates a newborn's vital signs. The acronym stands for:   Activity (muscle tone), Pulse, Grimace (reflex irritability), Appearance (skin color) and Respiration. Two points are possible for each criterion. A score of 7–10 is considered normal. *See* "APGAR Scoring for Newborns," available at http://www.childbirth.org/articles/apgar.html. Bridon scored 1 out of a possible 10 points.